# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
### (Bridgeport)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **SUSAN ROE, JR. ppa ATTY. LYNN JENKINS, GUARDIAN AD LITEM** | \* | **3:03 CV 571 (SRU)** |
| | \* | |
| | \* | **AUGUST $\underline{18}$, 2005** |
| **V.** | \* | |
| | \* | |
| **PHILIP GIORDANO & THE CITY OF WATERBURY, CONNECTICUT** | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

---

FILED

2005 AUG 22 P 2:04

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................1

STATEMENT OF THE CASE..................................................................2

STATEMENT OF FACTS......................................................................4

SUMMARY JUDGMENT STANDARD......................................................12

LAW AND ARGUMENT.......................................................................13

    I.    THE MAYOR ACTED UNDER THE COLOR OF STATE LAW
        AS THE FINAL POLICYMAKER FOR THE CITY IN THE AREAS
        IN WHICH HE DEPRIVED THE PLAINTIFF OF HER
        CONSTITUTIONAL RIGHTS..........................................................14

        A.  THE COURT SHOULD GRANT THE PLAINTIFF SUMMARY
            JUDGMENT AGAINST BOTH DEFENDANTS BASED ON THE
            DOCTRINE OF COLLATERAL ESTOPPEL......................................15

                1.  Collateral estoppel properly applies to both defendants because
                    the defendants are the same party and a party in privity from the
                    prior judgment...................................................................19

                2.  The material issues of fact pertaining to the plaintiff's § 1983
                    claims against the defendants are identical to the issues determined
                    in the prior judgment...........................................................23

                3.  The material issues of fact pertaining to the plaintiff's § 1983
                    claims against the defendants were actually litigated and actually
                    decided in the prior judgment................................................26

                4.  The material issues of fact pertaining to the plaintiff's § 1983
                    claims against the defendants were fully and fairly litigated in the
                    prior judgment...................................................................27

i

5.  The material issues of fact pertaining to the plaintiff's § 1983 claims against the defendants were necessary to support a valid and final judgment on the merits in the prior judgment....................28

B.  THE MAYOR IS LIABLE UNDER § 1983 BECAUSE HE DEPRIVED THE PLAINTIFF OF HER CONSTITUTIONAL RIGHTS WHILE ACTING UNDER THE COLOR OF STATE LAW................................29

1.  There are no genuine issues of material fact as to the Mayor depriving the plaintiff of her Constitutional rights to bodily integrity and to be free from sexual abuse................................30

    a.  The plaintiff has a well-established Constitutional right to bodily integrity and to be free from sexual abuse...............31

    b.  The Mayor deprived the plaintiff of her Constitutionally protected and secured rights......................................33

2.  There are no genuine issues of material fact as to the Mayor acting under the color of state law when he deprived the plaintiff of her Constitutional rights.............................................................34

C.  THE CITY IS LIABLE UNDER § 1983 BECAUSE THE MAYOR WAS THE CITY'S FINAL POLICYMAKER IN THE AREAS IN WHICH HE DEPRIVED THE PLAINTIFF OF HER CONSTITUTIONAL RIGHTS.........35

1.  There are no material issues of fact as to the Mayor being the final policymaker for the City in the areas in which he deprived the plaintiff of her Constitutional rights......................................................42

2.  There are no material issues of fact as to the Mayor being the final policymaker for the City in the area of political interests......................40

3.  The are no material issues of fact as to the Mayor being the final policymaker for the City in the area of safety and law enforcement...........41

4.  There are material issues of fact as to the Mayor being the final policymaker for the City in the area of social issues...........................42

CONCLUSION...................................................................................43
APPENDIX

## **PRELIMINARY STATEMENT**

The plaintiff, Susan Roe Jr., moves, pursuant to Rule 56(c) of The Federal Rules of Civil Procedure, for summary judgment as to her 42 U.S.C. § 1983 claims against defendants, Philip Giordano, and The City of Waterbury, Connecticut. Ms. Roe avers that her Motion for Summary Judgment, along with the supporting affidavit, the certified copy of the Federal District Court's transcript for the criminal trial of *U.S. v. Giordano* (Docket No. 3:01CR216(AHN), the Charter for the City of Waterbury, Connecticut as in effect between November 2000 and July 2001, and the City of Waterbury's Sexual Harassment Policy and attached memorandum all support her claim that there are no genuine issues of material fact regarding Ms. Roe's § 1983 claims against the defendants.

In the alternative, Ms. Roe asks, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, that if the Court does not find summary judgment is appropriate on all the issues now sought for relief, that an order be entered establishing which facts are uncontroverted and which facts are subject to genuine factual discovery.

Ms. Roe alleges in her complaint that the defendants violated her 14th Amendment rights under the Constitution of the United States to bodily integrity and to be free from sexual abuse. Ms. Roe alleges that the Mayor was acting under the color of state law, and as the final policymaker for the City of Waterbury in the areas in which he deprived her of these Constitutionally protected rights. As such Ms. Roe is entitled to relief under 42 U.S.C. § 1983.

Based on the standard of Rule 56(c) and the doctrine of collateral estoppel or issue preclusion, Ms. Roe is entitled to judgment as a matter of law for the above § 1983 claims as against both defendants. There are no genuine issues of material fact as to Mayor Giordano

depriving Ms. Roe of her Constitutional rights.  There are no genuine issues of material fact as to

Mayor Giordano acting under the color of state law when he deprived Ms. Roe of her

Constitutional rights.  There are no genuine issues of material fact as to Mayor Giordano being the

final policymaker for the City of Waterbury in the areas in which he deprived Ms. Roe of her

Constitutional rights.  The above issues of material facts are supported by the plaintiff's pleadings,

accompanying affidavit, trial transcript, and addendums and were previously decided in the

criminal trial of *U.S. v. Giordano*.

## STATEMENT OF THE CASE

On September 12, 2001, a federal grand jury returned an indictment against the Mayor of

Waterbury, Connecticut, Philip Giordano, charging him with violating the plaintiff's, Susan Roe

Jr.'s, and co-plaintiff's, Jane Doe Jr.'s, civil rights under 18 U.S.C. § 242.  The Mayor was also

charged with one count of conspiracy to violate 18 U.S.C. § 2425, and eleven counts of unlawful

use of interstate facilities to transmit information about a minor.   This indictment was handed

down following the Mayor's arrest by the United States Government on July 26, 2001.

On January 16, 2003, the grand jury returned an 18-count superseding indictment charging

the Mayor with the same federal offenses as the original account, including the two counts for

violating the plaintiff's and co-plaintiff's civil rights, along with an additional four charges under

18 U.S.C. § 2425.

The federal criminal trial of *U.S. v. Giordano* commenced in the Connecticut District

Court in Bridgeport, Connecticut on March 12, 2003.  After calling 48 witnesses, including Ms.

Roe, the Government concluded its case-in-chief on March 19, 2003.  The Mayor then presented

five witnesses in his defense and testified on his own behalf.  The Mayor made a Rule 29 motion

at the close of the Government's case and again renewed the motion at the close of his case, which was denied both times by the court. The parties then presented their closing arguments to the jury.

On March 25, 2003, the jury returned a verdict against the Mayor unanimously finding him guilty beyond a reasonable doubt of violating Ms. Roe's and Ms. Doe's 14th Amendment Constitutional rights while acting under the color of state law. The Mayor was also convicted on all other counts, save count 10, upon which the jury could not reach a unanimous verdict. Following the verdict, the Mayor filed for a motion for judgment of acquittal, which was denied by the court.

After a sentencing hearing, on June 13, 2003, the court sentenced the Mayor to 37 years of imprisonment. On June 19, 2003, the Mayor filed a notice of appeal. The Mayor is presently serving his sentence in a federal prison for, *inter alia*, violating Ms. Roe's Constitutionally protected rights while acting under the color of state law.

On March 31, 2003, the plaintiff, Susan Roe Jr., filed a complaint in this Court against the Mayor and the City of Waterbury, Connecticut (hereafter "the City"). Ms. Roe's complaint alleged, *inter alia*, that the Mayor and the City deprived Ms. Roe of her Constitutional rights, to wit, the 14th Amendment, to which upon the plaintiff is suing under 42 U.S.C. § 1983. The City filed a motion to dismiss on July 7, 2003. This Court denied the City's motion to dismiss.

On August 2, 2005, Ms. Roe moved to amend her Complaint.

The plaintiff now submits to the Court this Summary Judgment Motion and Memorandum of Law in support thereof, as to her § 1983 claims against the defendants.

Ms. Roe avers in her Motion for Summary Judgment that there are no genuine issues of material fact as to the Mayor depriving Ms. Roe of her 14th Amendment Constitutional rights to bodily integrity and to be free from sexual abuse, when he forced her to perform fellatio on him

3

and touched her genitalia and breasts.  Moreover, that there are no genuine issues of material fact as to the Mayor acting under the color of state law when he deprived Ms. Roe of her well-established Constitutional rights.  Further, that there are no genuine issues of material fact as to the Mayor being the final policymaker for the City in the areas in which he deprived Ms. Roe of her Constitutional rights, namely political interests, safety and law enforcement, and social issues.

## STATEMENT OF FACTS

Plaintiff, Susan Roe Jr., was and is a minor child, and was a resident of Waterbury, Connecticut during defendant's, Philip Giordano's, tenure as Mayor. (Addendum #1, Plaintiff's Affidavit).

The defendant, Philip Giordano (hereinafter "the Mayor"), was employed and paid by the City of Waterbury as the elected Mayor from 1996 until 2001. (Tr. at 70.)[1]

The defendant, the City of Waterbury (hereinafter "the City"), is and was a municipality located within the State of Connecticut with office buildings located at 235 and 236 Grand Street. (Addendum #2, City Charter for City of Waterbury, Connecticut).

On March 25, 2003, the Mayor was convicted on criminal charges of sexually abusing Ms. Roe and thereby violating her constitutionally protected rights under the 14th Amendment of the United States Constitution while he was the City's Mayor, with his mayoral powers vested under the City Charter for the City of Waterbury (hereinafter "the Charter")(Addendum #2)(See Appendix for *U.S. v. Giordano*, 324 F.Supp.2d 349 (D.Conn.2003) finding sufficient evidence to support conviction).

During Philip Giordano's tenure as Mayor, the City had a "strong mayor" charter, which established the Mayor as the Chief Executive Officer for the City in the areas of political interests,

---

[1] The "(Tr.)" abbreviation refers to the Official Transcript from the criminal trial of *U.S. v. Giordano*, Docket No. 3:01CR216(AHN).

4

safety and law enforcement, and social issues. Nancy DiLorenzo, a paralegal for Corporation

Counsel's Office for the City, testified, at the federal criminal trial, as to the Mayor's broad

powers under the City's "strong mayor" charter. The Charter was admitted as a full exhibit in the

criminal trial of *U.S. v. Giordano*. (Addendum #2 at §§ 2101-2103A)(Tr. at 28, 42-49, 61-64).

Section 2101 of the Charter established the Mayor as the <u>Chief Executive Officer</u> for the

City, and hence final policymaker in the area of protecting the City's residents' political interests.

Connecticut General Statutes § 7-193(2)[2] requires municipal charters to establish a chief officer

who may be the Mayor elected by the electors of the municipality.

The Charter's broad delegation of powers conferred upon the Mayor power:

> To control and supervise all officers and departments of the city
> or town and to that end shall have power to make and enforce
> such rules and regulation as he may deem advisable for and
> concerning the organization, management and operation of all
> offices and departments and the agencies which may be created
> for the administration of its affairs, and within the limits of
> appropriations, to have power to fix numbers and kinds of offices
> and positions and the rates of compensation for all officers and
> employees, except as otherwise provided.

(Addendum #2 at § 2102(e)).

The Charter vested in the Mayor power to act as "chairman, ex-officio…of all other boards

or commissions or authorities. . ." with the exception of appeal and review boards. (Addendum #2

at § 2101). This included "the power to preside at any meeting he shall attend", including the

power to cast the tie breaking vote at any meeting. (Addendum #2 at § 2103). Under the Charter,

the Mayor possessed power to "have a seat and voice and to introduce ordinances, but no vote, in

the board of alderman." (Addendum #2 at § 2102(g)).

---

[2] Section 7-193(2) states in pertinent part: "The municipality shall have a chief executive officer, who may be one of the following…a mayor elected by the electors of the municipality…."

The Mayor possessed the power to "suspend, pending hearing and action thereon, and to remove for cause, after due hearing, any board member appointed by the mayor or any appointed official, but not any elected official." (Addendum #2 at § 2102(d)). The Mayor could also appoint persons to municipal employment positions, and promote municipal employees. (Addendum #2 at § 2103(c)).

All of the various City departments' budget proposals would go to the Mayor for review and approval, including the budget for the Police Department. (Tr. at 73-75, 114). Furthermore, the Mayor was responsible for all contracts entered into on behalf of the City. (Addendum #2 at § 2102).

The Charter established the Mayor as the final policymaker in the area of City safety and law enforcement. The Mayor's duties under the Charter were to "cause the laws and ordinances to be executed and enforced and to conserve the peace within the city...." (Addendum #2 at § 2101(a))(emphasis added). The Charter gave the Mayor power to "assume the entire control and direction of the police and fire forces of the city, or either of them, for a period not exceeding fifteen (15) days, at his discretion, in case of emergency, and to exercise all of the powers conferred upon the police and fire departments in relation thereto." (Addendum #2 at § 2102(a)). Moreover, it gave the Mayor "all powers given by law to sheriffs in relation to riot assemblages" (Addendum #2 at §2102(b))(emphasis added), along with the power "to exert all the force necessary to enable him to execute the laws within the limits of the city" whenever the Mayor has reason to believe that opposition to the exercise of his authority will be made. (Addendum #2 at § 2102(c)).

During his tenure as Mayor, the defendant would act as chairman of the City's Police Board meetings. The Mayor gave the Superintendent of the Police Department orders to hire and

6

promote police officers, which were duly followed by the Superintendent. (Tr. at 23, 97-99, 127-29).

On April 16, 1996, the Mayor terminated the City's Superintendent of Police for insubordination. Thereafter, the Mayor had a hand in running the Police Department's internal operations. (Tr. at 102-05, 107-110).

Throughout the Mayor's tenure, the City's Police Department would regularly alert the Mayor of serious crime scenes within the City and the Mayor would show up at the crime scenes in his City issued police cruiser and be briefed by the officer in charge. The Mayor would also participate in police drug raids and other crime fighting operations within the City. (Tr. at 174-75, 178, 197-205, 232, 242, 245-46).

The Mayor implemented new hiring policies for the City's Police Department and played a key role in promoting police officers; he even made appointments to the City's Police Commission. At times, the Mayor would conduct roll call and address officers before their shifts were to begin. He would also attend the swearing in ceremonies for new officers and administered the Department's oath to new officers. (Tr. at 114, 180, 190, 247-49, 250-51, 354, 358).

The Mayor was the final policymaker for the City in the area of social issues. As such, the Mayor promulgated the City's Sexual Harassment Policy, with an attached memorandum written by him to all municipal employees. (Addendum #3, Sexual Harassment Policy, with attached Memorandum, 5/20/1996). The Mayor's memorandum stated, "It is my intention to keep Waterbury the fine place to live and work as is characteristic of its past. Through your help and effort in observing this policy, that tradition will continue." (Addendum #3).

The City's Sexual Harassment policy stated that sexual harassment is a violation of Title VII of the Civil Rights Act of 1964 as well as a violation of the State of Connecticut law.

(Addendum #3). The policy read "supervisors shall not use their authority to solicit subordinates for sexual favors. . . ." (Addendum #3). The policy defined physical sexual harassment as, "Unwanted physical contact, including touching, pinching, brushing the body, coerced sexual intercourse, assault." The sexual harassment policy and its attached memorandum were entered into evidence as a full exhibit during the criminal trial and testimony concerning its sections was given by Nancy DiLorenzo, a paralegal for The City's Corporation Counsel's Office. (Tr. at 49-53).

Between November 2000 and July 2001, Ms. Roe, then a child of eight years of age, was sexually abused by the Mayor on a weekly basis, with many of these sexual molestations taking place during normal business hours at a time when the Mayor was supposed to be engaged in municipal business. The Mayor coerced and forced Ms. Roe to perform fellatio on him on numerous occasions and touched Ms. Roe's genitalia and breasts. (Addendum #1)(Tr. at 426-27, 1086-89, 1139, 1075-77, 1086-89, 1194-96, 1198, 1201-08, 1214-20).

The Mayor would sexually molest and abuse Ms. Roe at the following locations: The Office of the Mayor at The Chase Building on 236 Grand Street, Waterbury Connecticut; 827 Oronoke Road, Building 10, Unit Three, Waterbury, Connecticut; the Mayor's home residence at 157 South Wind Road, Waterbury, Connecticut; the Mayor's law office at 1169 West Main Street, 1st Floor, Waterbury, Connecticut; the Mayor's City issued Crown Victoria police cruiser. (Addendum #1)(Tr. at 426-27, 1086-89, 1139, 1201-08, 1214-20.)

At the federal criminal trial, Ms. Roe testified, under oath, and subject to cross-examination, in detail about the acts of sexual abuse she was forced to perform on the Mayor. She testified that she performed fellatio on the Mayor, on at least two occasions, in the Mayor's Office. She testified that she believed the Mayor to watch over everyone like "God" and that she was

afraid of him because she believed he would have her mother and she put in jail if she told anyone about the abuse. (Addendum #1)(Tr. at 1191-1249).

After each of the sexual molestations, the Mayor would declare in front of Ms. Roe that her mother would go to jail if the plaintiff told anyone about the sexual abuse. (Addendum #1)(Tr. at 416, 424, 447, 448-49, 463).

During the federal criminal trial, the co-plaintiff, Jane Doe Jr., the other minor child the Mayor was found guilty of sexually abusing, testified, subject to cross examination, as to Ms. Roe being sexually abused at the Mayor's Office by the Mayor on at least two occasions. She further testified as to Ms. Roe and herself being forced to perform fellatio on the Mayor simultaneously or in turns. (Tr. at 1075-77, 1085-89, 1094-95, 1139).

These numerous sexual molestations were arranged by the Mayor over his City issued cellular phones that were used for conducting City business. The cellular phones issued to the Mayor, and used to make these calls, where paid for by the City, along with their fees and usage charges. At other times, the Mayor used the phone in the Mayor's Officer to make arrangements to sexually abuse Ms. Roe. (Tr. at 71, 253-55, 361, 406-07, 430, 434, 462, 470, 484, 914, 922, 928, 933-35, 939-41, 943, 951-52, 961, 964-66, 976, 978, 986-88, 1253).

Throughout his tenure, the Mayor drove two unmarked Crown Victoria police cruisers issued, owned, and maintained by the City of Waterbury. These vehicles were equipped with a full police package, including police scanner, siren, flashing lights, and bearing the Connecticut license plate "1-WBY". The Mayor also possessed and carried a badge that identified him as the City of Waterbury's Mayor. (Tr. at 117, 129, 212, 214, 236, 252, 257, 261, 291-92, 294, 364, 1268-69).

9

On July 26, 2001, the Mayor was arrested by the FBI and charged with

depriving the plaintiff of her constitutionally protected rights under 18 U.S.C. § 242.  Section 242

of Title 18 of the United States Code makes it a federal crime for anyone acting under the color of

law to willfully deprive a person of any rights, privileges, or immunities secured or protected by

the Constitution or laws of the United States. (Addendum #4, complete text of 18 U.S.C. § 242.)

On September 12, 2001, a grand jury returned a fourteen-count indicted against the

Mayor, including an indictment under 18 U.S.C § 242 for depriving the plaintiff of her

Constitutional rights. *Giordano*, 324 F.Supp.2d at 351.  The superseding indictment, adding four

additional counts, against the Mayor and was handed down on January 16, 2003.  (Addendum #5,

Superseding Indictment).

Count Two of the indictment charged the Mayor with:

while acting under the color of the laws of the State of Connecticut, did
willfully deprive Victim 2 [Susan Roe Jr.] of rights and privileges secured
and protected by the Constitution and laws of the United States, that is
the right not to be deprived of liberty without due process of law, which
includes the right to be free from aggravated sexual abuse and sexual
abuse by coercing and forcing Victim 2, who had not attained the age
of 12 years, to engage in fellatio and genital contact with GIORDANO
and by touching Victim's 2 genitals and breasts resulting in bodily
injury to Victim 2. All in violation of Section 242 of Title 18,
United States Code.

(Addendum #5)(Tr. at 2095-96).

The Mayor received a full and fair trial before a jury in the United States District Court in

Bridgeport, Connecticut, beginning on March 12, 2003, before the Honorable Judge Alan Nevas.

The defendant had the opportunity to cross-examine all of the 48 witnesses called by the

Government.  The defendant moved for a Rule 29 motion at the close of the Government's case,

which the court denied.  The defendant presented five witnesses in his defense.  The Mayor took

the stand and testified on his own behalf.  At the close of the defendant's case, the defendant

renewed his Rule 29, which the court denied.  Both parties then made there closing arguments.

(Tr. at 1, 14, 31, 37, 53, 67, 71, 75, 79, 84, 88, 90, 120, 168, 170, 181, 184, 194, 197, 205, 208,

222, 264, 288, 309, 327, 334, 367, 373, 486, 567, 580-81, 614, 622, 634, 635, 643, 648, 650, 657-

58, 661, 675-76, 682, 684, 686, 726, 760, 771, 776, 789, 790, 815-16, 855, 868, 881, 888, 1020,

1063, 1101, 1112, 1115, 1131, 1144, 1164, 1171, 1176, 1191, 1225, 1249, 1272, 1290, 1300,

1311, 1319, 1329-30, 1373, 1380, 1390-91, 1401, 1407, 1494, 1516-19, 1521, 1628, 1645, 1687,

1975, 1976, 1999, 2009-10, and 2050).

Before the jury deliberated, Judge Nevas instructed the jurors as to the necessary elements

the Government needed to prove beyond a reasonable doubt in order for the jury to find the Mayor

guilty under § 242.  Judge Nevas' instructions to the jury were:

> Before you can find the defendant guilty of the crimes charged
> in Counts 1 and 2 of the superseding indictment, you must find
> that the government has proved the following four elements
> beyond a reasonable doubt: First, that at various times from in or
> about November 2000 through July 2001 the defendant acted under
> color of the laws of the State of Connecticut. Second, that in so
> doing his conduct deprived victim one or victim two of some right
> secured or protected by the constitution of the United States; that is,
> the right to be free from aggravated sexual abuse and sexual abuse.
> Third, that the defendant acted willfully; that is, with specific intent to violate these
> protected, or this protected constitutional right. And
> fourth, that his acts resulted in the bodily injury to victim one or victim two.

(Tr. at 2102).

Judge Nevas' instructed the jury as to element of acting under the color of state law to

require a finding that the defendant "was acting or purporting to act in the performance of his

official duties..." when he violated the plaintiff's constitutional rights.  As to the second element,

Judge Nevas instructed the jury that they would have to find the defendant to have deprived the

plaintiff of her "Fourteenth Amendment right to personal bodily integrity and the right to be free

of unauthorized and unlawful physical abuse by state intrusion." The Judge's instructions also propounded on the latter two elements necessary for a conviction. (Tr. at 2103-08.)

On March 25, 2003, the jury returned a verdict. They found the Mayor guilty on seventeen-counts, including Count 2 of the Indictment for willfully depriving the plaintiff of her Constitutionally protected rights under the 14th Amendment and causing her bodily injury while acting under the color of state law as the Mayor for the City of Waterbury. (Tr. at 2143-46)(*Giordano*, 324 F.Supp.2d 349 (D.Conn.2003)).

## SUMMARY JUDGMENT STANDARD

The moving party is entitled to judgment as a matter of law "where the record <u>taken as a whole</u> could not lead a rational trier of fact to find for the non-moving party." *Konikoff v. Prudential Ins.*, 234 F.3d 92, 97 (2d Cir. 2000)(emphasis added); Rule 56(c) of Federal Rules of Civil Procedure.[3] "The court's role on a motion for summary judgment is not to decide disputed issues of fact but to determine whether there is a genuine issue of fact to be tried." *Rattner v. Netburn*, 930 F.2d 204, 209 (2d. Cir.1991). An issue is material only if "it might affect the outcome of the suit under the governing law." *Konikoff*, 234 F.3d at 97.

Summary judgment serves as an "integral part of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules, namely, to secure the just, speedy and inexpensive determination of every action." *Rivkin v. Coleman*, 914 F.Supp. 76, 77 (S.D.N.Y.1996)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

---

[3] "[I]f the court does not dispose of the entire case or grant all relief requested by a party on a summary judgment motion, it should, if practicable, enter an order establishing which facts are uncontroverted and which are subject to genuine factual discovery." *Robinson v. Transworld Systems*, Inc., 876 F.Supp. 385, 389 N.D.N.Y.1995)(*See also* Fed. R. Civ. Pro. 56(d)).

The party moving for summary judgment must only establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).

On the other hand, the party opposing the motion for summary judgment bears the burden of going <u>beyond</u> the pleadings and designating specific facts to show that there is indeed genuine factual issues for trial. *Amenesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002)(citing *Celotex Corp.,* 477 U.S. at 324)(emphasis added). The opposing party may <u>not</u> do so merely by making reference to its pleadings, *Celotex Corp.*, 477 U.S. at 325 (emphasis added), or through evidence that is "merely colorable, conclusory, speculative, or not significantly probative." *Dumont v. Administrative Officer*, 915 F.Supp. 671 (S.D.N.Y. 1996).[4]

Summary judgment should be granted "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied. *Celotex Corp.*, 477 U.S. at 323.

## LAW AND ARGUMENT

I.    **THE MAYOR ACTED UNDER THE COLOR OF STATE LAW AS THE FINAL POLICYMAKER FOR THE CITY IN THE AREAS IN WHICH HE DEPRIVED THE PLAINTIFF OF HER CONSTITUTIONAL RIGHTS.**

There are no material issues of fact as to the averments in Ms. Roe's complaint that the Mayor while acting under the color of state law and as the final policymaker for the City in the areas of political interest, safety and law enforcement, and social issues deprived Ms. Roe of her Constitutional rights to bodily integrity and to be free from sexual abuse under the 14th Amendment of the United States Constitution.

---

[4] *See* Fed. R. Civ. Pro. 56(e) "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

13

The Mayor deprived Ms. Roe of her 14th Amendment rights to bodily integrity and to be free from sexual abuse when he forced Ms. Roe, on numerous occasions, to engage in fellatio with him and touched her genitalia and breasts.  The Mayor was acting under the color of state law when he deprived Ms. Roe of these rights because in doing such he grossly abused the powers and the position of the Mayor's office.  The Mayor sexually abused Ms. Roe in the Office of the Mayor, the Mayor's City issued police cruiser, and numerous other locations throughout the City.  The Mayor arranged to meet Ms. Roe, in order for her to perform fellatio on him, over his City issued cellular phones all while validly possessing an official badge identifying him as the Mayor for the City of Waterbury.  The City Charter established the Mayor as the final policymaker for the City in the areas in which he deprived Ms. Roe of her Constitutional right.  The Mayor was the final policymaker for the City in the areas of political interests, safety and law enforcement, and social issues.

The above material issues of fact are supported by the record before the Court and have been previously decided in the plaintiff's favor in the criminal trial of *U.S. v. Giordano*. Therefore, the City and Mayor are liable under 42 U.S.C. § 1983[5] and Ms. Roe is entitled to judgment as a matter of law.

_____

[5] 42 U.S.C. § 1983 reads in full:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(Compare to Addendum #4).

## A. THE COURT SHOULD GRANT THE PLAINTIFF SUMMARY JUDGMENT AGAINST BOTH DEFENDANTS BASED ON THE DOCTRINE OF COLLATERAL ESTOPPEL.

The Court should grant the plaintiff summary judgment on the issues sought for relief based on the doctrine of collateral estoppel (also known as issue preclusion) because all the material issues of fact have already been determined against the defendants in the prior federal criminal trial of *U.S v. Giordano*. "Summary judgment is appropriate under the doctrine of collateral estoppel (issue preclusion) when all the material issues of fact in a pending action have been actually and necessarily resolved in a prior proceeding." *Mishkin v. Ageloff*, 299 F.Supp.2d 249, 252 (S.D.N.Y. 2004)(citing *State of New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 86 (2d Cir. 1999)).

The defendants are barred under the doctrine of collateral estoppel from relitigating the material issues of fact pertaining to Ms. Roe's § 1983 suit that have previously determined against the defendants in the prior judgment. The issues as to the Mayor depriving Ms. Roe of her Constitutional rights while acting under the color of state law as the final policymaker for the City in the areas in which he deprived Ms. Roe of her Constitutional rights has already been decided against both defendants in *U.S. v. Giordano*.

The court applies federal law in determining the preclusive effect a prior federal court judgment has on a subsequent claim arising under federal law. *Poe v. John Deere Co.*, 695 F.2d 1103, 1105 (8th Cir. 1982). For instance, in *NLRB v. Thalbo Corp.*, 171 F.3d. 102 (2d Cir. 1999), the Second Circuit applied federal collateral estoppel law in determining the preclusive effect a prior criminal judgment had on a subsequent § 1983 civil suit. Since the burden of proof in a criminal case is always higher than in a civil case, it is proper to rely on the collateral effect of a criminal conviction in a subsequent civil suit. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2nd Cir. 1986); *U.S. v. Podell*, 572 F.2d 31, 35 (2nd Cir. 1978). Thus, federal collateral estoppel law

should be applied in determining the preclusive effect the prior criminal judgment in *U.S. v. Giordano* has on the § 1983 civil suit against the defendants now before this Court.

Collateral estoppel properly applies to preclude a party and its <u>privies</u> from relitigating material issues of fact previously determined in a prior judgment where: (1) the issues in both proceedings are identical, (2) the issues in the prior proceeding were actually litigated and actually decided, (3) there was a full and fair opportunity to litigate in the prior proceeding, and (4) the issues previously litigated were necessary to support a valid and final judgment on the merits. *NLRB*, 171 F.3d at 109.

The United States Supreme Court established some time ago that collateral estoppel can be used <u>offensively</u>, as it is being asserted by the plaintiff in this matter, by a litigant that was not a party to a prior judgment in order to preclude a defendant from relitigating issues and facts resolved in the previous judgment. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979). The Court has concluded that the "preferable approach for dealing with these problems [whether to apply the doctrine of collateral estoppel] in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts <u>broad discretion</u> to determine when it should be applied." *Parklane Hosiery Co.* 439 U.S. at 331(emphasis added).

A criminal defendant, such as the Mayor, is precluded "from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue." *Gelb*, 798 F.2d at 43 (citing *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481 (1982). That the plaintiff in this suit is a private party is inconsequential to the Court's application of collateral estoppel based on the prior criminal judgment. Mutuality is not considered for preclusion purposes and a party other than the government can assert collateral

16

estoppel against a defendant based on a prior criminal conviction. *Central Hudson Gas & Electric Corp. v. Emperesa Naviera Santa*, 56 F.3d 359, 367 n.3 (2nd Cir. 1995); *Gelb*, 798 F.2d at 43.

To determine the estoppel effect a prior criminal judgment has on a subsequent civil suit, the court looks to the issues decided in the criminal case by examining "the <u>record of the criminal trial</u>, including the pleadings, the <u>evidence submitted</u>, and any opinions of the court." *Podell*, 572 F.2d at 36 (emphasis added). The Court here should examine, *inter alia*, the criminal trial record and transcript of *U.S. v. Giordano* together with The Charter for the City of Waterbury (Addendum #2), which was submitted as a full exhibit in the criminal trial in determining the preclusive effect the prior criminal judgment has on the issues and facts now before the Court in the plaintiff's § 1983 claims.

Federal district courts have consistently recognized the preclusive effect a prior criminal conviction can have on a subsequent civil suit. The Federal District Court for the Eastern District of New York found county correction officers, who were convicted of conspiracy to deprive an inmate of his 8th Amendment rights in a criminal action, to be collaterally estopped from relitigating the facts and issues regarding the violation of the inmate's 8th Amendment rights in a subsequent § 1983 civil suit. *Pizzuto v. County of Nassau*, 239 F.Supp.2d 301, 308-10 (E.D.N.Y. 2003).

The federal courts have further recognized the preclusive effect a prior criminal judgment against a defendant can have on the defendant's <u>privy</u> in a subsequent civil suit. The court in *Julius Nasso* precluded a civil defendant from relitigating issues in a civil trial that had already been determined against the defendant's <u>privies</u> in a previous criminal trial, regardless that the defendant was never convicted in the criminal trial. *Id.*, 202 F.3d at 87.

17

The case before the Court now is analogous to the two above cases. Here, the Court is asked to apply the doctrine of collateral estoppel to preclude the Mayor from relitigating issues of law and of facts in a § 1983 civil action that have already been determined against him in the prior criminal action. And like *Julius Nasso*, the Court is asked to apply collateral estoppel to preclude the City from relitigating issues of law and of facts in a civil suit that have already been determined against the City's privy, the Mayor, in a previous criminal trial.

The purposes behind the law of collateral estoppel is twofold: (1) to protect litigants from the burden of having to relitigate issues with a party, or the party's privy, that have already been determined in a prior action, and (2) to promote judicial economy by avoiding needless litigation. *Parklane Hosiery Co.*, 439 U.S. at 326. "The principal virtue of collateral estoppel is self-evident: it promotes judicial economy by reducing the burdens associated with revisiting an issue already decided." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 303 (2d Cir. 1999).

Applying the doctrine of collateral estoppel to the case before the Court now would serve the dual purposes of the doctrine. By applying the doctrine, the plaintiff would be lifted of the burden of having to relitigate issues that have already been determined against the defendants in a prior criminal action. Furthermore, judicial economy would be served, and court resources conserved, by avoiding needless relitigation on issues and facts previously litigated and determined.

One concern courts may have in applying collateral estoppel is that it could be unfair to a defendant who had little or no incentive in defending the previous charge, where the charges were of little consequence. *Parklane Hosiery Co.,* 439 U.S. at 330. Here, there is no danger that the defendant had little or no incentive to vigorously defend against the charges in the prior action. The defendant had all the incentive to vigorously defend himself, and did vigorously defend

himself against the charges in the prior action because the charges carried a penalty as great as life imprisonment.

Here, all the requirements for collateral estoppel are met. Thus, the Court should apply the doctrine to preclude the defendants from relitigating the issues and facts of Ms. Roe's § 1983 claims against the defendants.

### 1.   <u>Collateral estoppel properly applies to both defendants because the defendants are the same party and a party in privity from the prior judgment.</u>

The Doctrine of Collateral Estoppel is properly asserted against the defendants because the defendants are the same party and a party in privity from the prior action of *U.S. v. Giordano*. The defendant, Mayor Giordano, is the same party found guilty, *inter alia*, in the federal criminal trial of *U.S. v. Giordano*, for violating Ms. Roe's Constitutional rights under 18 U.S.C. § 242 while acting under the color of state law as the Mayor of Waterbury. The defendant, the City of Waterbury, is the Mayor's privy in regard to the issues now sought for summary judgment.

"Privity is a well-established component of the federal law of *res judicata*." *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995). That being so, "[a] privy is bound with respect to all the issues that were raised or could have been raised in the previous law suit." *Id.* (emphasis added). Moreover, the concept of privity is not an all-or-nothing application, but "[p]rivity may exist for the purpose of determining one legal question but not another depending on the circumstances and legal doctrines at issue. *Id.* Thus, the Court can find that the Mayor and the City were in privity as to the issue of the Mayor being the final policymaker for the City without necessarily having to find the two parties in privity as to, for example, the Mayor's use of interstate facility to transmit information about a minor.

19

principle of privity precludes a new defendant, in this case the City, from relitigating issues and facts decided in a prior action against the original defendant, here the Mayor, where the new defendant "has a sufficiently close relationship to the original defendant to justify preclusion." *Central Hudson Gas & Electric Corp.*, 56 F.3d at 367-68 (emphasis added). "The doctrine of privity, which extends the *res judicata* effect of a prior judgment to nonparties who are in privity with the parties to the first action, is to be applied with flexibility." *Amalgamated Sugar Co. v. NL Industries, Inc.*, 825 F.2d 634, 640 (2d Cir. 1987)(emphasis added).

The Mayor and the City had a sufficiently close relationship to establish them as privies for the purposes of issue preclusion. The Mayor and the City's municipal scope of powers both emanated from the City Charter. The Mayor was the top elected official for the City. The City paid the Mayor's salary, provided him with a office, police cruiser, badge, and cellular phones. The City had a "strong mayor" charter which delegated to the Mayor broad powers in running the City and setting final policy. For all practical purposes, the Mayor was the face of the City and the City was synonymous with the Mayor.

What is more, the Mayor had the same motive at the criminal trial as the City would have had to attempt to prove that the Mayor was not acting under the color of state law and to attempt to prove that the City Charter did not vest in the Mayor strong powers to set and control City policy. The Mayor had the same motive as the City to disprove the elements with which he was convicted, including the elements of depriving Ms. Roe of her Constitutional rights while acting under the color of state law.

The doctrine of issue preclusion can rightly act to bar "non-parties to earlier litigation not only when there was a formal arrangement for representation in, or actual control of, the earlier action, but also when interests involved in the prior litigation are virtually identical to those in the

20